The Honorable James L. Robart

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HANY VELETANLIC,<br><br>Defendant. | NO. CR18-162 JLR<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

## **INTRODUCTION**

Hany Veletanlic smuggled firearms and parts to multiple countries, including to individuals who Veletanlic later described as being part of a "Neo Nazi group and a terrorist organization." He possessed two illegal silencers, and lied to agents about having destroyed one of them. At the time of his arrest, he came to a scheduled meeting with agents armed with a pistol with an obliterated serial number, an assault rifle, and a stockpile of ammunition and magazines. After trial, it came to light that Veletanlic had disabled his court-ordered computer monitoring program shortly before trial had begun. More disturbingly, Veletanlic's jail calls and correspondence reveal that he was recently involved in a violent plot targeting one of the individuals involved in his case.

Government's Sentencing Memorandum - 1
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In light of the serious nature of the underlying offense conduct, as well as Veletanlic's highly concerning misconduct after trial, the government believes that a sentence at the high end of the Guidelines range, 97 months, is appropriate. He also should be sentenced to three years of supervised release.

## BACKGROUND

**A. The Underlying Offense Conduct**

As the Court heard at trial, Veletanlic committed three distinct sets of crimes.

First, Veletanlic repeatedly exported firearms and parts overseas. He admitting sending 15 to 20 packages to men in Sweden. He claimed to learn after shipping the items that the men were part of a "Neo Nazi group" and a "terrorist organization" who were "likely to commit violent crimes against refugees in Sweden." His actions were calculated and willful. He repeatedly lied on customs forms, claiming that the items he was shipping were bicycle parts. He used multiple fake return addresses and names to ship the items. He obliterated the serial numbers on the guns, to make them difficult to trace in the event they were seized. He also admitted to smuggling gun parts to individuals in Russia, Brazil, and France.

Second, Veletanlic possessed two illegal silencers. He initially surrendered one of the silencers after being confronted by agents. He told agents that he had destroyed another silencer and no longer had it. Approximately a week later, he admitted that he had lied, and surrendered the second silencer to agents.

Third, Veletanlic possessed a loaded gun with an obliterated serial number. The circumstances of this offense are particularly troubling. Agents had scheduled a meeting with Veletanlic. He showed up with the gun concealed in his front waist—he claimed it was to use on himself if needed. However, when agents searched the car he had driven to the meeting, they found that Veletanlic had arrived ready for a firefight. Specifically, he had stored in his car an assault rifle, multiple extended magazines, and a cache of ammunition, as depicted in this photograph:

Government's Sentencing Memorandum - 2
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



### B. Veletanlic's Other Breaches of the Court's Trust

In addition to his criminal activity, Veletanlic also willfully violated his pretrial bond in a manner that is troubling. Specifically, as the Court found, Veletanlic used an unmonitored computer <u>and</u> cell phone. Although Veletanlic claimed that he did so because the monitoring software impeded his ability to run his business, the timing is highly suspicious. Specifically, after living with the software for *over eight months*, Veletanlic suddenly, on the eve of trial, started using unmonitored devices without telling Probation. It seems highly likely that Veletanlic made the switch not because of some sudden concern about the software, but rather to be able to send unmonitored messages pertaining to the trial.

### C. Veletanlic's Post-Trial Conduct

#### a. The Initial Investigation

After trial, two inmates came forward to report that Veletanlic was plotting to kill

Government's Sentencing Memorandum - 3
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

R.K. *See* Affidavit of Glenn Karabeika ¶ 5. As the Court will recall, during the trial and in pre-trial motion practice, Veletanlic had tried to shift blame for some of the charged conduct and for the prosecution itself onto R.K., and had listed R.K. as a witness, although ultimately R.K. did not testify at trial. *See id.* ¶¶ 6, 30.

The facts and circumstances of what the government knows about the plot are set forth in the attached Affidavit of Special Agent Karabeika. In short, when the inmates came forward, they provided a note that Veletanlic later admitted writing. *Id.* ¶ 6. In the note, Veletanlic directed his friend Alex to gather four guns:

> 1. GREEN WALTHER P22 + 2 MAGAZINES + 100 RD SUBSONIC 22LR AMMO
> 2. "BOTTLE HALF FULL" – THE ONE FROM BILL, JERRY KNOWS
> 3. BASIC 9MM PISTOL, NOTHING RARE OR CUSTOM + 2 MAGAZINES GLOCK 17 WILL DO, + 50 ROUNDS OF QUALITY HP-DEFENSE AMMO
> 4. BASIC MILITARY 16" AR-15 M4, FROM THE BOX OF MANY + 2 METAL MIL-SPEC 30RD MAGAZINES FULL OF BRASS-CASED FACTORY AMMO, NO RELOADS. MAKE SURE IT HAS A GOOD CARRY HANDLE REAR SIGHT.

*See id.* Exh. 2. Veletanlic also asked Alex to ensure the guns were "zeroed in at 25 yards, and said that someone would pick up the guns. *Id.* He provided a code phrase to use in the operation, and instructed Alex to keep quiet. *Id.*

The inmates later passed a second note, also in Veletanlic's handwriting, that contained addresses associated with R.K. *Id.* One of the inmates reported that they had told Veletanlic that they were part of a gang, and that a fellow gang member could handle the killing. *Id.* ¶ 3. The inmate suggested that an undercover officer pose as the gang member willing to kill R.K. *Id.* Agents directed the inmate to tell Veletanlic that a gang member, *i.e.*, an undercover officer, would deliver the note.

Agents meanwhile listened to Veletanlic's jail calls. On May 2, 2019, four days before the inmates had come forward, Veletanlic called his friend, Jay. *Id.* ¶ 11. During the call, Veletanlic asked Jay to look up addresses for his "very dear friend," which later

Government's Sentencing Memorandum - 4
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

became clear was R.K. *Id.* Veletanlic said that he needed the addresses for a "book" he was writing" and that he "really, really" needed the addresses. *Id.*

On May 3, 2019, the following day, Veletanlic asked Jay again for the addresses. *Id.* ¶ 12. Jay asked if the addresses were for a "book." Veletanlic replied, "Yeah, that's all I can say." *Id.* Veletanlic pressed Jay on the timing, explaining, "I'm eager to get started, if you know what I mean." *Id.* at 3. Over the course of the next few days, Veletanlic called Jay multiple times, repeatedly pressing him for R.K.'s addresses. *Id.* ¶¶ 13-17.

On May 7, 2019, Veletanlic asked Jay to tell Alex that it was "really important" that he be at the shop. *Id.* ¶ 16. On the following day, Veletanlic reminded Jay to ensure that Alex would be at the shop. *Id.* ¶ 17. Veletanlic said that there would be "special mail" arriving at the shop in the next few days, and that Alex was to "grab[] it in person." *Id.* Veletanlic also referenced that he would have Alex ship something out in the future. *Id.*

On May 10, 2019, Veletanlic called Alex, and asked whether any letters had arrived. *Id.* ¶ 18. Veletanlic said that there was going to be a certified letter that would be arriving, and that it related to some "insurance documents." *Id.* He said that the letter would "explain everything" and that it was "really, really, really, important." *Id.*

On May 13, 2019, an undercover officer delivered to Alex Veletanlic's letter that had been passed to law enforcement by the inmates. *Id.* ¶ 10. The officer told Alex that he would return on May 17, 2019. *Id.*

On May 15, 2019, Veletanlic called Alex. *Id.* ¶ 19. Veletanlic told Alex he had given Jerry a "bag with all my, you know, important life – life documents. Most of it's insurance stuff. In that bag, there is a short -- it's probably the shortest document in the whole thing. The shortest one." Veletanlic said he needed this one "the most," explaining "it's a life insurance thing." *Id.* He said that Jerry "doesn't have to do anything-- anything. Just simply give it to you." *Id.* Veletanlic cautioned: "And, uh, dude, don't -- don't tell him anything else. Simply that my life depends on it and I'm

Government's Sentencing Memorandum - 5
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

coming up on deadlines." *Id.* Veletanlic emphasized: "If I don't get my money, I'm not going to be able to fight this. And if I don't get those particular documents, I am not going to be able to fight shit. I am gonna be sentenced to fucking ten years." *Id.* He said that if Jerry resisted, then Alex was "to put a squeeze on him, you do whatever it takes. But you put a squeeze on him." *Id.*

Later that day, Veletanlic and Alex talked again. *Id.* ¶ 20. Alex said he had asked Jerry for "papers," that Jerry had gone pale, and was unwilling to help. *Id.* Veletanlic repeatedly implored Alex to go to Jerry and "grab all that stuff from him." *Id.*

On the following day, May 16, 2019, Veletanlic and Alex talked again. *Id.* ¶ 21. Veletanlic expressed concern that Jerry would talk with Veletanlic's attorneys. *Id.* Alex said he had spoken with Jerry and assured Veletanlic that Jerry would do nothing. *Id.* Veletanlic expressed relief, saying: "If he now goes and tries to do some craziness, try to talk to my lawyers, try to complicate things and you know -- I'm in the middle of the most -- now we're going into sentencing, bro. Do you know how fucking important this is? It's how many years I'm going to spend in prison." *Id.* Veletanlic expressed his unhappiness with Jerry, saying: "Yeah, someday when I'm deported and I try to -- and -- and I find a way to come back, you know, someday I'll have a talk with him about that, how -- how much of a bitch piece of shit he was." *Id.* Veletanlic then said his "deadline" was the following day, *i.e.*, when the undercover was slated to return to the shop to pick up the guns. *Id.* Veletanlic instructed Alex to remove the cushions of the couch at the shop where "documents" had been stashed. *Id.* Alex said that Jerry had already "cleaned it up" and that the items were no longer in the couch. *Id.* Veletanlic then instructed Alex to withdraw $1000 in cash from the business account and put the money in two envelopes. *Id.* at 6-7. Veletanlic said he would "confirm everything's good tomorrow." *Id.*

Veletanlic also called Jay. *Id.* ¶ 23. Veletanlic asked Jay to retrieve a particular person's phone number. *Id.* One of the inmates had told agents that after Veletanlic had been unable to get the guns, that Veletanlic had said that the guns could be purchased

Government's Sentencing Memorandum - 6
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

from this individual using the money that Veletanlic had directed Alex to give to the undercover agent. *Id.*

On May 17, 2019, the undercover agent returned to the shop. *Id.* ¶ 24. Alex gave him two envelopes that each contained $400 in cash. *Id.* The undercover, referring to the firearms, asked Alex: "what about the other thing bro?" *Id.* Alex responded: "The guy . . . yeah, that didn't work out." *Id.* The undercover then said that the firearms on the list were nice. Alex responded, "I know, the . . . I'm not Jerry. He fucking wigged out. It was . . . it . . . it almost turned into a situation." *Id.*

On May 21, 2019, at 3:50 p.m., Emma Scanlan, one of Veletanlic's attorneys, emailed AUSA Matthew Diggs. *Id.* ¶ 25. She wrote: "I met with Mr. Veletanlic today and I am very concerned about his safety and the safety of [R.K.] Can you give me a call?" *Id.* An agent returned her call, but they were not able to speak until the following day. *Id.* Ms. Scanlan said that Veletanlic had told her that two inmates knew R.K. and planned to rob and murder him. *Id.* She said that the inmates had extorted Veletanlic for money to spare R.K. from harm. *Id.* According to Ms. Scanlan, Veletanlic said that Alex had made two payments to an individual who showed up at his business. *Id.* Finally, she said that Veletanlic claimed to have been paying off the inmates' drug debts. *Id.*

On May 21, 2019, a few hours after Ms. Scanlan emailed the USAO, one of the inmates spoke to Veletanlic while wearing a recording device. *Id.* ¶ 26. The inmate asked Veletanlic, "All right. So you're good with the snatch off the traffic stop? Is that what we're doing?" *Id.*[1] Veletanlic replied: "I don't know, man. It's -- it's -- you know, I can't do anything from here." *Id.* The inmate then said: "No, I -- we got this. It's just what do you want done?" *Id.* Veletanlic replied: "I -- I -- I -- I really -- I -- I really don't want to -- you know, I really don't want to know any -- any of this, dude." *Id.* The inmate then said that they had been discussing this plan for over two weeks. *Id.*

---

[1] According to one of the inmates, he and Veletanlic had discussed approaching R.K. while he was in his car. *See* Affidavit of Karabeika ¶ 26.

Government's Sentencing Memorandum - 7
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Veletanlic replied, "Yeah, I -- I -- hey, man. I really don't -- the less I know, the better." *Id.* Veletanlic later said: "I know -- I know this is all -- this is all cool and great. But, uh, I mean, dude, you're -- you're talking about hitting on a guy. It's -- it's not -- you're not doing me a favor. It's not going to do me any -any good. So I -- I'd really rather not have any part in this. And -- and -- and quite frankly, just knowing, I -- I -- I have to object." *Id.* Later in the conversation, Veletanlic denied wanting anyone dead, and that said that having R.K. being killed would not help his case. *Id.*

### b. Veletanlic's Account of What Occurred

The government provided to the defense a copy of Special Agent Karabeika's affidavit, along with the exhibits and discovery about the jailhouse incident, in advance of sentencing. In response, the defense provided a signed declaration from Veletanlic, a copy of which is attached to this memorandum. According to the declaration, Veletanlic told the inmates that he was planning on publicly exposing R.K.'s "illegal business dealings." *See* Affidavit of Veletanlic ¶ 6. Veletanlic claims that he referred to his efforts to expose R.K. as his "book." ███████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████ Veletanlic claims that he reluctantly agreed. *Id.* at p. 3, ¶ 2. He said that he believed that the inmates planned to sell the guns for profit to pay off drug debts that the two allegedly owed. *Id.* at p. 4, ¶¶ 3, 7. Veletanlic maintains that he tried to signal to his friend not to transfer the guns by writing that the guns were to be "scrubbed" of their serial numbers. *Id.* at p. 4, ¶ 9. According to Veletanlic, he believed that his friend would refuse to participate in the scheme because the serial numbers were to be obliterated. *Id.* Veletanlic claims that the inmates subsequently "became frustrated and began to discuss robbing and likely harming" R.K. *Id.* at p. 4, ¶ 10. Veletanlic claims that "[a]t the earliest, safe opportunity," he told his attorneys what had happened to "ensure no actual harm would come" to R.K.

There are several problems with Veletanlic's account.

Government's Sentencing Memorandum - 8
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*First*, even under Veletanlic's version of events, he admits that he had control over multiple guns, despite repeated representations to the Court during detention proceedings that he had relinquished control over all of his firearms.

*Second*, it is not believable that Veletanlic tried to signal to his friends not to transfer by the guns by insisting that the serial numbers be obliterated. Notably, after his friends refused to transfer the guns, Veletanlic did not express relief or satisfaction. Rather, he went into a frenzied state, and made multiple, additional pleas to get his friends to transfer the guns. *See* Affidavit of Karabeika ¶¶ 20-21.

*Third*, Veletanlic's claim that he contacted his attorneys at the "earliest, safe opportunity" is implausible. Veletanlic started collecting R.K.'s addresses on May 2. *Id.* ¶ 11. He did not notify his attorneys about the plot until May 21. *Id.* ¶ 25. During this nineteen-day period, Veletanlic, in both emails and phone calls, repeatedly passed messages to his attorneys through his friends about a variety of matters, none of which pertained to the plot. According to jailhouse emails and calls, he appears to have *met in person* with a defense investigator on May 15, and, by his own admission, did not mention the plot. He also repeatedly expressed concern that his friends would talk to his attorneys about the plot, and instructed them to keep quiet. *Id.* In addition, he also could have mentioned the plot during any one of his numerous phone calls or emails to his friends, particularly in light of his contention that he was trying to signal to his friends that something was amiss by insisting that the serial numbers be obliterated. Finally, he had countless opportunities to mention the plot to any number of prison officials.

*Fourth*, Veletanlic's claim that he was collecting R.K's addresses for a "book" is wholly implausible. Veletanlic very well may have contemplated writing something about R.K., given his obsessive hatred of him. Veletanlic, however, was frantically collecting R.K.'s addresses, repeatedly telling his friend that he needed the addresses quickly, which is inconsistent with a long-term project of writing a "book." *Id.* ¶¶ 11-15, 17. Veletanlic also was careful not to use R.K.'s true name over the phone, consistently referring to him as a "very dear friend." If Veletanlic had been collecting the addresses

Government's Sentencing Memorandum - 9
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

for a legitimate purpose, there would have been no need to use a code phrase in lieu of R.K.'s real name.

*Fifth*, Veletanlic's story is difficult to reconcile with how he reacted when confronted by the inmate wearing the recording device. When the inmate referenced the plot, Veletanlic said, "you're talking about hitting on a guy." *Id.* ¶ 26. In his declaration, Veletanlic described the plot as involving the *robbery* or *extortion* of R.K. for money, not as a "hit." Indeed, neither inmate had any grudge against R.K., such that either would be motivated to carry out of a hit of R.K. In addition, the *absence* of what Veletanlic said to the inmates is telling. Veletanlic didn't tell the inmates that he had been forced into the plot, that he had resisted it from the beginning, or otherwise reference being extorted by the inmates.

### c. Conclusion

At the end of the day, the precise circumstances of how the plot to target R.K. came into existence, how it unfolded, and whether the inmates put any pressure on Veletanlic, are unknown. But, even when viewing the evidence in the light most favorable to Veletanlic, his conduct was highly concerning, and should be considered by the Court in fashioning its sentence. At bottom, Veletanlic, from inside a prison, directed that multiple guns be transferred to a person he thought was associated with a violent gang who was targeting R.K. He gathered addresses for R.K., and passed them to the person holding himself out as a hitman. He did not alert either his attorneys or the authorities until the very end of the plot, and instructed his friends to keep quiet. Perhaps most concerning, several material aspects of his explanation for what happened are clearly not credible, confirming his bad intent.

Veletanlic was convicted of exporting guns to a violent group, and possessing illegal firearms, including a gun with an obliterated serial number. While awaiting sentencing for these offenses, he tried to transfer guns with obliterated serial numbers to another violent group. His post-trial conduct is aggravating and should serve as a basis to enhance his sentence.

Government's Sentencing Memorandum - 10
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# SENTENCING GUIDELINES

The government concurs with Probation's calculation of the Guidelines.

Veletanlic was convicted of four counts, which break into two groups: Count 1 and Counts 2-4.[2]

Count 1, the Arms Export Control Act, carries a base offense level of 26, with no further adjustments.

Counts 2-4, which pertain to Veletanlic's possession of the silencers and the gun with the obliterated serial number, score as follows:

| | |
|---|---|
| • Base Offense Level (due to possession of silencers) (§ 2K2.1(a)(5)) | 18 |
| • 3-7 Firearms (two silencers and handgun with no serial number) (§ 2K2.1(b)(1)(A)) | +2 |
| • Obliterated serial number (§ 2K2.1(b)(4)(B)) | +4 |
| Total for Counts 2-4 | 24 |

Under the Guidelines, each group is assigned one unit because the two groups are within four offense levels of each other. *See* USSG § 3D1.4(a). As a result, the offense level for the most serious group, in this case 26, is increased by two levels, yielding a total offense level of 28. *Id.* Veletanlic has no known criminal history, and thus his Guidelines range is 78-97 months.

During circulation of the presentence report, Veletanlic made two objections to the Guidelines calculation. First, Veletanlic argued that he should be entitled to a two-level reduction for acceptance of responsibility because he went to trial to avoid potential immigration consequences, rather than to dispute the essential elements of guilt. As the Ninth Circuit has instructed, the critical question is not *why* the defendant proceeded to trial, but rather whether the defendant has expressed ***contrition*** for his actions despite proceeding to trial. *See United States v. Ochoa-Gaytan*, 265 F.3d 837, 843

---

[2] The applicable Guideline for Counts 2-4 is section 2K2.1. Under USSG § 3D1.2(d), all counts that refer to section 2K2.1 typically group together.

Government's Sentencing Memorandum - 11
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(9th Cir. 2001). The defendant bears the burden of this showing, and the Court should consider the circumstances outlined in Application Note 1 to section 3E1.1:

> (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). . . . .
>
> (B) voluntary termination or withdrawal from criminal conduct or associations;
>
> (C) voluntary payment of restitution prior to adjudication of guilt;
>
> (D) voluntary surrender to authorities promptly after commission of the offense;
>
> (E) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;
>
> (F) voluntary resignation from the office or position held during the commission of the offense;
>
> (G) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and
>
> (H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

App. Note 1 to USSG § 3E1.1.

Veletanlic has not met his burden. First, he was not entirely truthful to agents. As demonstrated at trial, he lied to agents about possessing the silencer that was the subject of Count 3. He also initially mislead agents as to the number and scope of packages that he shipped overseas. Second, he did not voluntarily terminate his criminal conduct. Rather, he brought an illegal firearm to a meeting with agents after having previously been confronted about his exports and the silencers. He also was involved in the plot from the jail that targeted an individual in the case. Third, as the Court found, Veletanlic did not provide credible testimony during the suppression hearing. The Court did not credit Veletanlic's account of what had happened, which included his false assertion that

Government's Sentencing Memorandum - 12
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

agents explicitly threatened him with arrest if he did not consent to the search. Fourth, he did not simply put the government to its burden at trial—rather he, among other things, put on affirmative evidence attempting to show that the serial number on the gun was not in fact obliterated. Fourth, he attempted to intimidate agents, as reflected by the text messages that were outlined in the government's submission regarding post-trial detention. *See* Exhibit A to Dkt. 139 at 22 ("It's getting hard containing the rage I have after getting to see how your kind "works" . . . Talked to few feds the other day, you people are about extortion."); *id.* at 2 ("Whatever feds decide to 'take' from me is going up in flames, just don't wanna pull the trigger too soon and look like an asshole."); *id.* at 9 ("I'd rather not breathe air than allow my self to be humiliated anymore. I'm just telling you as clear as I can possibly be, this is the end of the road for me. . . . I will Never stare down a [barrel] of any gun or sit in a court room of someone who plays God."). In sum, Veletanlic has not met his burden of showing full acceptance of responsibility.

During circulation of the presentence report, Veletanlic also argued that all all four counts of conviction should group, because they are "connected by a common criminal objective," and constitute "part of a common scheme or plan." *See* 3D1.2(b) (counts group together when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"). In this case, the conduct that forms the basis of Count 1 was distinct from the conduct that forms the basis of Counts 2 – 4. Specifically, Count 1 dealt with the export of a single firearm to Sweden, while Counts 2-4 dealt with Veletanlic's possession of firearms in the United States that were not slated for export. If Veletanlic had possessed the firearms in Counts 2-4 *as part of a plan to export them to Sweden*, the counts might all group. *But cf. United States v. Hoffman,* 10 F.3d 808 (9th Cir. 1993) (unpublished) (rejecting notion that multiple exports group if the shipments are distinct from one another and involve different recipients). But, in fact, there was no relationship between the firearms that formed the basis of Counts 2-4 and the export that was charged

Government's Sentencing Memorandum - 13
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in Count 1. Accordingly, Probation correctly determined that Count 1 does not group with Counts 2-4.

## SECTION 3553 ANALYSIS

For the reasons that follow, the Court should sentence Veletanlic to 97 months of imprisonment and three years of supervised release.

**A.     Nature and Circumstances of the Offenses**

The offenses in this case were extremely serious. Veletanlic smuggled firearms and parts to a group that he said he later learned were engaged in violence. He obliterated the serial numbers, a hallmark of guns that will be used for a criminal purpose. In addition, he brought his own gun with an obliterated serial number *to a meeting with agents*. He also illegally possessed multiple silencers, controlled under the National Firearms Act, and lied to agents about possessing one of them.

**B.     Personal History and Characteristics of the Defendant**

Veletanlic consistently showed erratic and concerning behavior throughout the course of the case, whether it be his conduct as part of the plot against R.K., his intimidating text messages to agents, or his actions in circumventing the computer monitoring condition on the eve of trial.

In his presentence interview, Veletanlic told a story of horrific childhood abuse during the Balkan conflict. It is difficult to know whether to accept the story, given the Probation Officer was unable to verify any parts of it, and Veletanlic has repeatedly not told the truth during various stages of this case. In addition, he told his Probation Officer that he lacked contact information for his mother, who presumably could verify some of the information he reported. PSR ¶ 55. Veletanlic, however, knew, at a minimum, his mother's contact information shortly after the interview—she appears on his contact list at the FDC, authorized to communicate with him by both phone and email.[3]

---

[3] The presentence report interview occurred on April 3, 2019. *See* PSR ¶ 53. His mother was first listed as an authorized contact at the FDC on May 20, 2019.

Government's Sentencing Memorandum - 14
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C. The Need to Reflect the Seriousness of the Offense and to Prove General Deterrence.**

This sentencing raises serious concerns about the need to promote general deterrence, along with the need to reflect the seriousness of the offense. Individuals must know that there are serious consequences to willfully disregarding the licensing scheme, and smuggling guns to a criminal group overseas. A message must be sent that individuals cannot take the law into their own hands, particularly where there are serious safety issues at stake. There are countless individuals located overseas who have a desire for U.S. weapons that they wish to acquire to further their cause. A sufficiently serious sentence should be imposed to account for the need to provide deterrence and otherwise to reflect the seriousness of the offense.

**D. The Need to Protect the Public from Further Crimes of the Defendant.**

As detailed above, Veletanlic is at a high risk of re-offending. First, he committed Count 4, possession of a gun with the obliterated serial number, while in contact with agents, in the hope of avoiding prosecution for his other conduct. Second, he engaged in the jailhouse plot *while pending sentencing* for the instant offenses. Third, during a recorded call, he promised to return to the United States if deported, and to confront a person who he was unhappy with regarding their reluctance to participate in the jailhouse plot. *See* Affidavit of Special Agent Glenn Karabeika ¶ 22. The Court should be very concerned about Veletanlic's stability, and his risk of engaging in further criminal activity.

//
//
//

Government's Sentencing Memorandum - 15
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **CONCLUSION**

For the foregoing reasons, the Court should sentence Veletanlic to 97 months of imprisonment and three years of supervised release.

DATED this 28th day of October, 2019.

                                                Respectfully submitted,

                                                BRIAN T. MORAN
                                                United States Attorney

                                                */s/ Thomas M. Woods*
                                                THOMAS M. WOODS
                                                Assistant United States Attorney
                                                United States Attorney's Office
                                                700 Stewart Street, Suite 5220
                                                Seattle, Washington 98101
                                                Phone: (206) 553-7970

Government's Sentencing Memorandum - 16
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record for the Defendant.

*/s/ Salee Porter*
SALEE PORTER
Paralegal
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-7970

Government's Sentencing Memorandum - 17
*United States v. Veletanlic*, CR18-162JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970