# AFFIDAVIT

STATE OF WASHINGTON   )
                      )  ss
COUNTY OF KING        )

I, Glenn Karabeika, hereby state under oath as follows:

## AFFIANT BACKGROUND

1. I am a Special Agent with the U.S. Department of Homeland Security (DHS), Homeland Security Investigations (HSI), assigned to the Office of the Special Agent in Charge, Seattle, Washington. I have been employed as a Special Agent with HSI and its predecessor agency since 1988. I am currently assigned to the Counter-Proliferation Investigations Group, where I investigate cases involving the illegal export of weapons and other items from the United States.

2. I have received formal training at the Federal Law Enforcement Training Center in Glynco, Georgia. Based on my training and experience, I am familiar with the manner in which individuals illegally acquire and export controlled merchandise from the United States to foreign countries.

3. The facts set forth in this Affidavit are based on my own personal knowledge; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

## SUMMARY OF INVESTIGATION

4. On May 6, 2019, an Assistant Federal Public Defender ("AFPD") contacted the Office of the United States Attorney (the "USAO"). The AFPD represented an inmate who was incarcerated at FDC SeaTac ("CS1"). CS1 was pending trial on various child pornography charges, including production of child pornography, which carries a

fifteen-year-mandatory minimum sentence. He also was facing charges in state court for child molestation in the first degree. He has several prior convictions, including for dishonesty, such as Obstructing Legal Process, Receiving Stolen Property, Identity Theft, and Theft. He also has a history of drug abuse, and is believed to have made false statements to law enforcement when confronted about aspects of his criminal conduct.

5. CS1 had written a letter, which the AFPD provided the USAO. *See* Exhibit 1. In the letter, CS1 said that Veletanlic had approached him and offered $80,000 to murder R.K. *Id.* at 1. During the trial and in pre-trial motion practice, Veletanlic had tried to shift blame for some of the charged conduct and for the prosecution itself onto R.K., and had listed R.K. as a witness, though ultimately R.K. did not testify at trial. CS1 said that Veletanlic would provide the guns for the murder. *Id.*

6. The AFPD also provided a note that CS1 had allegedly obtained from Veletanlic. *See* Exhibit 2. The handwriting in the note appears to match Veletanlic's handwriting. Veletanlic's note was addressed to "Alex," a man later identified as Alexander Thumm. In the note, Veletanlic directed Alex to contact "Jerry," a man later identified as Jerome Evans. *Id.*[1] Veletanlic told Alex to get four particular guns from Jerry. *Id.* Alex was to tell Jerry to test the guns to ensure they were in working condition, and ensure the rifle was "zeroed in at 25 yards." *Id.* Veletanlic told Alex to put the guns in a box and that someone would come by and pick up the guns in person at Veletanlic's shop. *Id.* Veletanlic instructed Alex to destroy the note after the pickup, and stated: "No names, no photos, no small talk." *Id.* The letter also referenced a code phrase that Alex was supposed to use. *Id.*

7. On May 8, 2019, I met with CS1 pursuant to a standard proffer letter. *See* Exhibit 3. CS1 repeated what he had said in his letter. He also said that Veletanlic had initially expressed interest in harming the Assistant United States Attorneys who had handled the trial, but that Veletanlic had focused on R.K. CS1 said that he had told

---

[1] During jailhouse calls, transcripts of which are being submitted to the Court, Veletanlic refers to Alex and Jerry by their first names. To avoid confusion, I refer to these individuals by the first names as well.

Veletanlic that he knew a gang member who could kill R.K. According to CS1, Veletanlic agreed, and said he would provide the guns to be used in the killing. CS1 said he contacted law enforcement with the hope that agents could introduce an undercover agent to pose as the hitman.

8. CS1 said that a second inmate, CS2, knew of the plot and was willing to cooperate. CS2 is pending sentencing for offenses involving extensive fraudulent and violent conduct.

9. On May 10, 2019, CS2 passed two notes to his attorney, who in turn provided the notes to agents. *See* Exhibit 4. The two notes appeared to be in Veletanlic's handwriting. The first note was materially identical to the note that AFPD had given agents, and was addressed to Alex in Veletanlic's handwriting *Id.* at 1. The second note contained addresses associated with R.K. *Id.* at 2. According to CS1, he had told Veletanlic that he had passed the notes to the gang member who was planning the hit.

10. On May 13, 2019, an undercover officer (the "UC") went to Veletanlic's shop in Tulalip. The UC provided Alex with a copy of the note that was addressed to Alex that CS2 had provided agents. The UC said he would return on Friday, *i.e.*, May 17, 2019.

11. In an attempt to understand the full scope of what had occurred, I went back and listened to Veletanlic's jail calls, which corroborated part of what CS1 had reported, and referenced many of the events that then unfolded. On May 2, 2019, Veletanlic called a friend, Jay St. Michell. *See* Exhibit 5. During the call, Veletanlic asked Jay to look up the address for his "very dear friend." *Id.* at 2. Veletanlic said he knew the location, but not the exact address of the "friend." *Id.* Jay said the person was associated with multiple addresses, and agreed to look them up. *Id.* Veletanlic said he needed the addresses for a "book" he was writing. Veletanlic emphasized that he "really, really" needed the addresses. *Id.* at 3.

12. On May 3, 2019, Veletanlic asked Jay again for the addresses. *See* Exhibit 6 at 2. Jay said he would look up the addresses over the weekend. Jay asked if the

addresses were for a "book." *Id.* Veletanlic replied, "Yeah, that's all I can say." *Id.* Veletanlic pressed Jay on the timing, explaining, "I'm eager to get started, if you know what I mean." *Id.* at 3.

13.  On May 4, 2019, Veletanlic called Jay and asked whether he had gotten the "book info." *See* Exhibit 7 at 2. When Jay said he had not, Veletanlic pressed him to get the information that day or the next. *Id.* Veletanlic said it was "kind of really important" for Jay to get all of the addresses. *Id.* at 4. Veletanlic said "around here, as soon as you say you'll start writing, it's kind of like you got to start" because "everybody takes your word for it." *Id.*

14.  Later that day, Veletanlic called Jay, who provided multiple addresses associated with R.K. *See* Exhibit 8. One of these addresses appeared in the note that CS2 provided agents that was in Veletanlic's handwriting. Veletanlic said: "Let's research more if you can. And then . . . you can give me more info. Because you know, book has got to be good." *Id.* at 7.

15.  On May 6, 2019, Veletanlic called Jay again. *See* Exhibit 9. Veletanlic pressed Jay to continue looking for addresses. *Id.* at 2. Veletanlic said he was writing a "novel" based on "true events" and he repeatedly pressed Jay to research additional addresses associated with R.K. *Id.* at 8.

16.  Veletanlic followed up with Jay the following day. *See* Exhibit 10. Veletanlic asked Jay to tell Alex that it was "really important" that he be at the shop. *Id.* at 2-3. Later during the call, Veletanlic complained about R.K. by name. *Id.* at 3. Jay later in the call provided additional information about where to locate R.K. *Id.* at 6-8.

17.  On May 8, 2019, Veletanlic called Jay, who provided additional addresses for R.K., including the remaining two addresses that appeared in the note that CS2 provided to agents. *See* Exhibit 11 at 3-6. Veletanlic reminded Jay to ensure that Alex would be at the shop. *Id.* at 8-9. Veletanlic said that there would be "special mail" arriving at the shop in the next few days, and that Alex was to "grab[] it in person." *Id.* at

8. Veletanlic also referenced that he would have Alex ship something out in the future. *Id.* at 9.

18. On May 10, 2019, the day before the UC dropped off the letter, Veletanlic called Alex, and asked whether any letters had arrived. *See* Exhibit 12 at 2. Veletanlic said that there was going to be a certified letter that would be arriving, and that it related to some "insurance documents." *Id.* at 3. He said that the letter would "explain everything" and that it was "really, really, really, important." *Id.*

19. On May 15, 2019, after the note was delivered, Veletanlic called Alex. *See* Exhibit 13. Veletanlic told Alex he had given Jerry a "bag with all my, you know, important life – life documents. Most of it's insurance stuff. In that bag, there is a short -- it's probably the shortest document in the whole thing. The shortest one." *Id.* at 2. Veletanlic said he needed this one "the most," explaining "it's a life insurance thing." *Id.* He said that Jerry "doesn't have to do anything-- anything. Just simply give it to you." *Id.* at 3. Veletanlic cautioned: "And, uh, dude, don't -- don't tell him anything else. Simply that my life depends on it and I'm coming up on deadlines." *Id.* Veletanlic emphasized: "If I don't get my money, I'm not going to be able to fight this. And if I don't get those particular documents, I am not going to be able to fight shit. I am gonna be sentenced to fucking ten years." *Id.* at 4. He said that if Jerry resisted, then Alex was "to put a squeeze on him, you do whatever it takes. But you put a squeeze on him." *Id.* at 5.

20. Later that day, Veletanlic and Alex talked again. *See* Exhibit 14. Alex said he had asked Jerry for "papers," that Jerry had gone pale, and was unwilling to help. *Id.* at 3. Veletanlic repeatedly implored Alex to go to Jerry and "grab all that stuff from him." *Id.* at 4. Veletanlic said, "This is -- this is the biggest thing I've -- I've ever needed someone to do for me." *Id.* at 3. Alex said that he didn't know what to grab. *Id.* Veletanlic said: "Oh, it's just -- it's just a bunch of -- bunch of legal papers. And it's all legal. You know what I mean? I don't -- I don't need -- you know, that's - that's -- that's the thing. If -- if he's gonna -- if he's gonna have my -- my -- my insurance, you

know, documentation now, and he's going to withhold it and not give it to me in a time when I need it, then I got to get [it]." *Id.* at 4. Alex reiterated that Jerry had "freaked out" and said Jerry had spoken with Jay. *Id.* Veletanlic grew increasingly concerned and said, "this is serious." *Id.* at 5. Veletanlic said: " I mean, is there any indication that this guy is unstable. Because if he is this unstable, I cannot have him be holding any fucking documentation." *Id.* at 7. He went on to say: "I mean, Alex, is there any way that you can hunt them down and say, dude, just -- I mean, whatever needs to be done just to get it." *Id.* Alex said he would call Jay. *Id.* at 8. Veletanlic went on to say: "If I don't do this, then I'm not gonna need Jerry's help of holding any -- any paperwork for me because there's not going to be need for any paperwork. And if this is what he's gonna do, then, you guys go ahead and get it." *Id.* at 9. Veletanlic emphasized: "It's one of those times that's -- where this can't fail. If this fails, my life is gone. There's not going to be me anymore. There's not going to be anything anymore. This is how this is important. This is why I'm so calm now. That's -- and that is why [Jerry], if he doesn't understand this, he can no longer be someone who I can trust with this much responsibility." *Id.* at 10.

21.  On the following day, May 16, 2019, Veletanlic and Alex talked again. *See* Exhibit 15. Veletanlic expressed concern that Jerry would talk with Veletanlic's attorneys. *Id.* at 2. Alex said he had spoken with Jerry and assured Veletanlic that Jerry would do nothing. *Id.* at 2-3. Veletanlic expressed relief, saying: "If he now goes and tries to do some craziness, try to talk to my lawyers, try to complicate things and you know -- I'm in the middle of the most -- now we're going into sentencing, bro. Do you know how fucking important this is? It's how many years I'm going to spend in prison." *Id.* at 3-4. Veletanlic expressed his unhappiness with Jerry, saying: "Yeah, someday when I'm deported and I try to -- and -- and I find a way to come back, you know, someday I'll have a talk with him about that, how -- how much of a bitch piece of shit he was." *Id.* at 5. Veletanlic then said his "deadline" was the following day, *i.e.*, when the UC was slated to return to the shop to pick up the guns. *Id.* Veletanlic instructed Alex to

remove the cushions of the couch at the shop where "documents" had been stashed. *Id.* at 6. Alex said that Jerry had already "cleaned it up" and that the items were no longer in the couch. *Id.* at 6. Veletanlic then instructed Alex to withdraw $1000 in cash from the business account and put the money in two envelopes. *Id.* at 6-7. Veletanlic said he would "confirm everything's good tomorrow." *Id.* at 10.

22. Veletanlic called back Alex later that day. *See* Exhibit 16. Veletanlic said that the cash amount had changed, and that Alex should put $400 in each of the two envelopes. *Id.* at 2. Veletanlic said that everything was otherwise good for the following day. *Id.*

23. Veletanlic also called Jay. *See* Exhibit 17. They talked about how Jerry had "went off the handle." *Id.* at 3. Veletanlic made a number of statements reflecting his concern that Jerry would talk about what had happened. *Id.* at 7-11, 16. Veletanlic concluded: "He has actually single-handedly tried to prevent me from ever getting out of here." *Id.* at 18. Of significance, Veletanlic also asked Jay to retrieve a particular person's phone number. *See id.* at 2. CS1 told agents that after Veletanlic had been unable to get the guns, that Veletanlic had said that the guns could be purchased from this individual using the money that Veletanlic had directed Alex to give to the UC.

24. On May 17, 2019, the UC returned to the shop. Alex gave him two envelopes that each contained $400 in cash. The UC, referring to the firearms, asked Alex: "what about the other thing bro?" Alex responded: "The guy . . . yeah, that didn't work out." The UC then said that the firearms on the list were nice. Alex responded, "I know, the . . . I'm not Jerry. He fucking wigged out. It was . . . it . . . it almost turned into a situation." The UC then left.

25. On May 21, 2019, at 3:50 p.m., Veletanlic's attorney, Emma Scanlan, emailed AUSA Matthew Diggs. She wrote: "I met with Mr. Veletanlic today and I am very concerned about his safety and the safety of [R.K.] Can you give me a call?" Special Grigore was asked by the USAO to call Ms. Scanlan. Special Agent Grigore called her that day, but they did not speak until the following day. Ms. Scanlan said that

Veletanlic had told her that two inmates knew R.K. and planned to rob and murder him. She said that the inmates had extorted Veletanlic for money to spare R.K. from harm. According to Ms. Scanlan, Veletanlic said that Alex had made two payments to an individual who showed up at his business. Finally, she said that Veletanlic claimed to have been paying off the inmates' drug debts.

26. On May 21, 2019, a few hours after Ms. Scanlan emailed the USAO, CS1 spoke to Veletanlic while wearing a recording device. CS1 asked Veletanlic, "All right. So you're good with the snatch off the traffic stop? Is that what we're doing?" *See* Exhibit 18 at 2.[2] Veletanlic replied: "I don't know, man. It's -- it's -- you know, I can't do anything from here." *Id.* CS1 then said: "No, I -- we got this. It's just what do you want done?" *Id.* Veletanlic replied: "I -- I -- I -- I really -- I -- I really don't want to -- you know, I really don't want to know any -- any of this, dude." *Id.* CS1 then said that they had been discussing this plan for over two weeks. *Id.* Veletanlic then said, "Yeah, I -- I -- hey, man. I really don't -- the less I know, the better." *Id.* Veletanlic later said: "I know -- I know this is all -- this is all cool and great. But, uh, I mean, dude, you're -- you're talking about hitting on a guy. It's -- it's not -- you're not doing me a favor. It's not going to do me any -any good. So I -- I'd really rather not have any part in this. And -- and -- and quite frankly, just knowing, I -- I -- I have to object." *Id.* at 4. Later in the conversation, Veletanlic denied wanting anyone dead, and that said that having R.K. being killed would not help his case. *Id.* at 10-11.

27. On May 30, 2019, I spoke with Alex. *See* Exhibit 19. He acknowledged receiving the note from the UC, said that the note matched Veletanlic's handwriting. He also admitted to later providing the agent with the two envelopes of cash. *See* Exhibit 19. He said that he understood that when Veletanlic referred to "documents" that he meant firearms. He denied knowing why Veletanlic wanted the guns.

---

[2] According to CS1, he and Veletanlic had discussed approaching R.K. while he was in his car.

28. On that same day, I spoke with Jerry. *See* Exhibit 20. He said that Alex had shown him the note that had been delivered by the UC shortly after it had been delivered. He said he thought Veletanlic was trying to frame him, and urged Alex to show the note to Jay. He said he cut all ties with Veletanlic after seeing the note.

29. On July 12, 2019, I spoke with Jay. *See* Exhibit 21. Jay said that Veletanlic had long harbored the belief that he had gotten into trouble because of R.K. According to Jay, Veletanlic believed that agents knew that R.K. had committed serious misconduct, and but they felt they couldn't arrest him because allegedly he had served as an informant. Veletanlic felt he had been arrested for his conduct because R.K. was allegedly untouchable and someone had to "take the fall." Jay denied knowing that

//

//

//

<303>

Veletanlic had ever intended to hurt R.K. or anyone else, and said he genuinely believed that Veletanlic had been writing a book about his case, and that he needed information about R.K. for the book.

I swear that the foregoing is true and correct to the best of my knowledge and belief.

GLENN KARABEIKA, Affiant
Special Agent, HSI